UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAN C.,<br><br>              Plaintiff,<br><br>       v.<br><br>ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY, *et al.*,<br><br>              Defendants. | Case No. 2:22-cv-03647-FLA (AJRx)<br><br>**ORDER FOLLOWING BENCH TRIAL** |

## RULING

This matter arises from the denial of a request for benefits under a tax-exempt, multi-employer health plan (the "Plan"), governed by the terms of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Plaintiff Dan C. ("Plaintiff") brings claims for denial for benefits under 29 U.S.C. § 1132(a)(1)(B) and breach of fiduciary duty under 29 U.S.C. § 1132(a)(3) against Defendant Director's Guild of America ("DGA" or "Defendant").[1]

On January 3, 2024, the court held a bench trial in this case. Dkts. 111, 114. After evaluating the evidence at trial, including making determinations of credibility, the court issues the following findings of fact and conclusions of law.

### I.  FINDINGS OF FACT[2]

####   A.  The Plan

The healthcare plan at issue ("Plan"), which is governed by ERISA, provides medical, dental, and vision benefits for its participants and their covered dependents. DGA 408.[3]  The Plan documents consist of the Summary Plan Description ("SPD") and DGA-Producer Pension and Health Plans Health Trust Agreement ("Trust Agreement").  DGA 4247–4439.  Plaintiff Dan C. ("Plaintiff") is a participant in the Plan, and his minor son, R.C., is a beneficiary as a member of his immediate family.

The Plan states, in relevant part, that the Board of Trustees ("Trustees") "have the sole complete and discretionary authority to … make any and all other findings of

---

[1] Plaintiff originally brought this action against DGA and Anthem Blue Cross Life and Health Insurance Company ("Anthem").  Anthem was dismissed as a defendant on November 14, 2023.  Dkt. 99.

[2] The characterization of a finding as one of "fact" or "law" is not controlling.  To the extent a finding is characterized as one of "law" but is more properly characterized as one of "fact" (or vice versa), substance shall prevail over form.

[3] "DGA" citations and corresponding Bates numbering refer to the administrative record filed by DGA at Dkt. 76 *et seq.*

fact, construction, interpretations and decisions relative to the [Plan]," as well as to "construe and/or interpret any provisions of the [Plan]." DGA 4269–70; 4308. Accordingly, the Trustees are jointly responsible for interpreting Plan provisions and establishing rules and regulations governing entitlement of benefits and administration of the Plan. DGA 4259–62. The Trustees "may designate in writing persons who are not Trustees to carry out fiduciary or non-fiduciary responsibilities or duties of the Trustees." DGA 4271. The Plan further provides that the Trustees may establish committees, whose general purpose "is to study and debate issues that arise in the administration of the [Health Plan] and to make recommendations" to the Trustees. DGA 4273. "By resolution duly adopted," the Trustees may also "allocate and delegate to a committee the authority to take final action in specified areas; and in such instances the action of the committee shall have the same binding effect as action by the full Board" of Trustees. *Id.* The Plan establishes the Benefits Committee as one of several standing committees and states it has the authority and responsibility for "approving benefit awards, and hearing and determining claims appeals." DGA 4274.

Anthem serves as Claim Administrator for certain services, including for residential treatment. DGA 4313. For appeal administration, the Plan relies on third-party medical reviewers, such as the Medical Review Institute of America ("MRIA"), to make decisions related to benefits determinations. Under the Plan, all approved treatment must be "medically necessary." DGA 4363. A treatment or service is "medically necessary" when it is:

- Consistent with generally accepted medical practice within the medical community for the diagnosis or direct care of symptoms, sickness or injury of the patient, or for routine screening examination under wellness benefits, where and at the time the treatment, service or supply is rendered (the determination of "generally accepted medical practice" is the prerogative of the Health Plan through consultation

      with appropriate authoritative medical, surgical, or dental practitioners);

- Ordered by the attending licensed physician … and not solely for the convenience of the participant, his or her physician, Hospital or other care health provider;

- Consistent with professionally recognized standards of care in the medical community with respect to quality, frequency and duration; and

- The most appropriate and cost-efficient treatment service, or supply that can be safely provided, at the most cost-efficient and medically appropriate site and level of service.

DGA 4423–24.

     **B.**    **R.C.'s History and Medical Treatment**

R.C. was born in Haiti and placed for adoption at an early age, following the death of his biological mother. DGA 81. Plaintiff adopted R.C. in November 2013, when R.C. was three years old. DGA 82. By the age of five, R.C. began to display challenging behavioral problems, and was noted to exhibit explosive outbursts of anger toward his parents, siblings, and teachers, such as punching his sister, brandishing a knife, and smashing objects. *Id.* In early 2015, R.C. was referred to Tracy Carlis, Ph.D., who diagnosed him with reactive attachment disorder. *Id.* Thereafter, he was referred to Maureen Donley, who diagnosed him with developmental trauma. *Id.*

From 2016 to 2017, R.C. was treated by numerous mental health professionals for various behavioral issues. R.C. was prescribed medication for anxiety, focus, and impulse control, and began working with medical professionals for treatment for parental training, cognitive therapy, behavioral therapy, social skills training, and neuropsychological training. DGA 83–85. In sum, R.C.'s diagnoses included (1) reactive attachment disorder, (2) developmental trauma, (3) disruptive mood dysregulation disorder, (4) generalized anxiety disorder, and (5) ADHD. DGA 82–85. His diagnoses continued to manifest as violent outbursts, in which he would often

scream at his teachers, throw items at other students, and attack his parents and siblings. DGA 83–85. In 2020, R.C.'s aggressive and violent behavior escalated, and, at the recommendation of treatment providers, his family explored residential treatment facilities. DGA 86.

On July 1, 2020, when R.C. was nine years old, he was admitted to Sandhill, a residential treatment center, for issues relating to emotional dysregulation, physical aggression, and low frustration tolerance. DGA 86–87. He was reported as lacking control of situations, leading to negative behaviors, such as screaming, breaking objects, slamming doors, engaging in self-deprecating comments, and becoming physically aggressive toward others. DGA 505. His diagnoses were noted as attention deficit/hyperactivity disorder, disruptive mood dysregulation disorder, other specified anxiety disorder, reactive attachment disorder, and oppositional defiant disorder. DGA 509–10.

R.C. was eventually asked to leave Sandhill due to sexually inappropriate conduct with another boy at the facility, and Sandhill's inability to provide R.C. with a private room. DGA 94–95. At the time of R.C.'s discharge, the clinical director of Sandhill stated R.C. "manifest[ed] some readiness to work with his avoidance of vulnerable feelings," but that Sandhill was concerned about his boldness in engaging in sexually inappropriate activity, and "how quickly he had figured out how to beat [their] security systems and procedures." DGA 680. Thus, it was Sandhill's "strong recommendation … that [R.C.] continued to need the services of a residential care level[.]" *Id.*

On August 4, 2020, R.C. was admitted to and received residential care at Intermountain, a treatment facility in Helena, Montana. DGA 3. While at Intermountain, R.C. attended school and received individual, family, and group therapy. The administrative record includes Intermountain's daily report logs for R.C.'s stay, which contain shift notes, information from therapy sessions, and treatment plans and notes. DGA 682–2323, 2545–4203.

5

### C. Denial of Benefits and Appeals

In August 2020, Anthem received from Plaintiff a request for service at Intermountain for seven days, starting on August 4, 2020. DGA 8–10. Anthem approved three of the requested days, from August 4 to 6, but denied all remaining treatment as not medically necessary, stating:

> The plan clinical criteria considers ongoing residential treatment medically necessary for those who are a danger to themselves or others … This service can also be medically necessary for those who have a mental health condition that is causing serious problems with functioning. (For example, being impulsive or abusive, very poor self care, not sleeping or eating, avoidance of personal interactions, or unable to perform usual obligations) … The information we have does not show you are a danger to yourself or others. For this reason, the request is denied as not medically necessary.

DGA 12.

Plaintiff requested a review of Anthem's denial of benefits from August 7 onwards. Plaintiff's appeal packet included, in relevant part, a 112-page appeal letter, a neuropsychological assessment of R.C. by Karen L. Schitz, PhD., photographs of damaged property, medical records from Sandhill, a clinical neuropsychological reassessment by Dr. Schitz, five letters of medical necessity from various treatment providers (including from the Clinical Director of Sandhill), and thousands of pages of medical records and treatment notes. DGA 65–2329.

Anthem upheld its denial of benefits, writing it had "reviewed all that was given to us for the appeal," including "new information from the medical record plus letters," but "still [did] not think [residential treatment care was] medically necessary[.]" DGA 26. Anthem noted it believed R.C. was "no longer at risk for serious harm that needed 24 hour care" after his initial three days of treatment at Intermountain, and "could have been treated with outpatient services." *Id.*

Plaintiff thereafter submitted an appeal to Defendant (providing the same materials he had provided to Anthem), which sent the appeal to a third-party reviewer,

6

MRIA. DGA 2330–31. The appeal was reviewed by Dr. William Holmes, M.D. ("Dr. Holmes"), on behalf of MRIA. DGA 2334. In a report dated June 15, 2021, Dr. Holmes opined the treatment was not consistent with generally accepted medical practice, consistent with professionally recognized standards of care, or the most appropriate treatment. DGA 2333. Dr. Holmes further concluded continued residential treatment was not medically necessary because, as of August 7, 2020, "there was no ongoing evidence of persistent risk of harm to self or others, no significant aggression or threatening behavior, and no evidence of serious impairment of daily functioning … The patient's clinical presentation supports intensive services in a partial hospitalized program (PHP) or intensive outpatient program[.]" DGA 2332. On June 24, 2021, Defendant informed Plaintiff his claims were denied for failure to meet the Plan's definition of medical necessity, and adopted Dr. Holmes' findings. DGA 2335–37.

Plaintiff was informed he could appeal further (DGA 2336–37), and submitted a second-level appeal to Defendant. DGA 2354–2407. Defendant again sent the file to MRIA (DGA 4211–12), and Dr. Holmes again reviewed the request. DGA 4213–16. In a report dated July 11, 2021, Dr. Holmes concluded the services were not medically necessary under the Plan's definition, re-stating his findings and conclusions from his June 15, 2021 report. DGA 4214–16. On August 10, 2021, Defendant, relying upon the reviews and determinations by Anthem and MRIA, denied Plaintiff's appeal. DGA 7.

## II.     STANDARD OF REVIEW

In the Ninth Circuit, actions to recover benefits under ERISA are adjudicated by bench trial under Fed. R. Civ. P. 52(a) ("Rule 52(a)"). *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-95 (9th Cir. 1999). Under Rule 52(a), the court can resolve factual issues in favor of either party, and must "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a).

///

7

## III. CONCLUSIONS OF LAW

### A. Standard of Review for Denial of Benefits

As a threshold matter, the parties debate the appropriate standard of review applicable to this matter. The default standard of review for a denial of benefits claim under ERISA is *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "[F]or a plan to alter the standard of review from the default of *de novo* to the more lenient abuse of discretion, the plan must unambiguously provide discretion to the administrator." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (*en banc*) (*citing Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir. 1999)). "ERISA plans are insufficient to confer discretionary authority on the administrator when they do not grant any power to construe the terms of the plan." *Id.* at 964. Here, as the Benefits Committee denied Plaintiff's appeal of Anthem's eligibility determination, the relevant question is whether the Benefits Committee possessed the requisite discretion to warrant review under an abuse of discretion standard.[4] *See Abatie*, 458 F.3d at 963.

The Trust Agreement states, in relevant part, that the Trustees "have sole, complete, and absolute discretionary authority to … make any and all findings of fact, constructions, interpretations and decisions relative to the [Plan], as well as to interpret any provisions of the [Plan]...." *Id.* ¶ 6. The Trust Agreement further states the Trustees "may designate in writing persons who are not Trustees to carry out fiduciary or non-fiduciary responsibilities or duties of the Trustees," (DGA 4271), and allows the Trustees, "*by resolution duly adopted*," to delegate to a committee "the

---

[4] As Anthem has since been dismissed from the action, the court focuses solely on whether the Benefits Committee possessed the requisite discretionary authority to warrant an abuse of discretion standard of review. *See* Dkt. 98 at 8 ("[I]t is the Plan's decision, via the Benefits Committee, to deny Plaintiff's appeal that is at issue.").

8

authority to take final action in specified areas[.]" DGA at 4273 (emphasis added). The Plan documents, however, only establish the Benefits Committee as a standing committee, with the responsibilities of "approving benefit awards, and hearing and determining claims appeals." *Id.* at 4274. Defendant does not identify any separate resolution, writing, or evidence clearly establishing that the Trustees vested the Benefits Committee with discretionary authority to "take final action in certain areas."

Absent evidence of a resolution or other writing, as required by the Trust Agreement, clearly and unambiguously conferring the Benefits Committee with the authority to make final decisions on behalf of the Trustees on denial of claim appeals, the court cannot conclude the Benefits Committee possessed the requisite authority for a discretionary standard of review. Accordingly, the court reviews Plaintiff's claim under a *de novo* standard and "evaluate[s] whether the plan administrator correctly or incorrectly denied benefits, without reference to whether the administrator operated under a conflict of interest." *Abatie*, 458 F.3d at 963.[5]

### B. Denial of Benefits

#### 1. Medical Necessity

Plaintiff has satisfied his burden of proving medical necessity as to the treatment at issue with credible, persuasive evidence. The record is replete with instances of dangerous and inappropriate behavior, making clear R.C. posed a threat to himself and others, and required regular emotional and physical intervention. *See*

---

[5] Nevertheless, as detailed below, Plaintiff's claims prevail under either standard of review. "A plan administrator abuses its discretion if it renders a decision without any explanation, construes provisions of the plan in a way that conflicts with the plain language of the plan, or fails to develop facts necessary to its determination." *Anderson v. Suburban Teamsters of N. Ill. Pension Fund Bd. Of Trustees*, 588 F.3d 641, 649 (9th Cir. 2009). Regardless of the standard of review, "[w]hat the district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." *Abatie*, 458 F.3d at 963.

9

DGA 12 (defining ongoing residential treatment as "medically necessary for those who are a danger to themselves or others … This service can also be medically necessary for those who have a mental health condition that is causing serious problems with functioning. (For example, being impulsive or abusive, very poor self care, not sleeping or eating, avoidance of personal interactions, or unable to perform usual obligations).").[6]

Defendant cherry-picks favorable treatment notes and reports from Intermountain's records which purport to reflect that R.C.'s condition was managed while at the facility, and thus, did not require residential treatment. For example, Defendant relies on R.C's. intake assessment, which reflects R.C. displayed no aggression, hallucinations, or suicidal ideations. DGA 2163. Other daily logs state R.C. "did well with doing independent activities," "was able to accept support from staff throughout the day," "apologized for being rude," "met all expectations without any issues during the school day," and was "compliant, interactive, and motivated." DGA 689, 735, 741, 2228; *see also* DGA 1655 ("[R.C.] was hyper upon waking up for the day, but redirected quickly when adults set clear expectations in the moment. Overall, he did well accepting limits and tolerating adult support."); DGA 1328 ("[R.C.] had a positive attitude and was on task as a student throughout the day. He accepted routines without any issues and verbalized his feelings."); DGA 906 ("[R.C.] started his day with too much energy and began to dysregulate, but he was able to rein himself in and keep it under control after a short stop & think.").

As Plaintiff notes, however, Defendant's selective reliance on discrete treatment notes misrepresents the totality of the circumstances and cannot justify a denial of benefits. Despite the positive treatment notes, R.C. continued to exhibit risky and

---

[6] Additionally, both Anthem and MRIA relied upon the "MCG Guidelines," which define "danger to self" or others as being present where there is "indication or report of significant physical or sexual risky behavior with impaired impulse control, judgment, or insight that significantly endangers self." Dkt. 77-1 at 276–80.

10

1 dangerous behavior, impaired judgment, and emotional difficulties that could not have
2 been managed without residential treatment, due to his violent and threatening nature
3 and impaired daily functioning. Several of these events occurred months into R.C.'s
4 stay at Intermountain and continued long after his first three days at the facility.

5       To provide only a few examples, R.C. attempted to sneak into a peer's room at
6 night (DGA 101), threatened to "kill everyone in the cottage" and "stab them all with
7 a knife," (DGA 116), and had several violent outbursts. *See* DGA 976 (R.C. "tried to
8 instigate his peer … [by] calling him a 'bitch," and later stated "I'm going to kill"
9 him); DGA 1191 (noting R.C. threw Legos around and hit a staff member and
10 described "in detail how he was going to kill his cottage peers and their families. He
11 described disemboweling them and sneaking into their rooms at night to kill them.");
12 DGA 827 ("When directed to take a shower, he began cursing and attempted to pull
13 [staff] to the ground … When staff opened the door, he was wielding [the shower
14 curtain rod] like a spear and said he was going to kill them.").

15       R.C. struggled to tolerate structure and lack of attention from peers and adults,
16 and often became aggressive with staff, requiring repeated physical intervention due
17 to "threat of imminent serious harm to self and others." DGA 1191; *see* DGA 989
18 (90-day review reflects nine instances of physical intervention and two instances of
19 mild sexual behavior); DGA 3769 (treatment note stating R.C. would hit, punch, and
20 kick the staff and stated that "it makes him feel better if he hits staff"). On one
21 occasion, after becoming irritated at peers and staff, R.C. "took his fork and started to
22 stab his mouth …." DGA 3710. On another occasion, R.C. "threw a punch at staff,
23 and a holding [physical restraint] was initiated," which lasted 26 minutes. DGA 3708.
24 R.C. was also noted to have engaged in incidents of self-harm and demonstrated a lack
25 of impulse control and basic functioning. A staff member noted R.C. pulled a "nickel-
26 sized chunk of hair out of his head" (DGA 1075), engaged in "mild sexual behaviors
27 includ[ing] … talking suggestively [and] sexual gestures" (DGA 1477), and urinated
28 on the bathroom floor and in his dresser drawers (DGA 988–89). *See also* DGA 1058

(noting R.C. appeared to have pulled out more of his hair), 988–89 (90-day review states R.C. "needs help with personal hygiene and his hair care … need[s] help from adults to put his dirty clothes in the laundry, and not hide them in his room"). Notably, too, after being physically restrained after an outburst where R.C. showed "unsafe behavior," R.C. "started talking about being the 'Messiah' and hearing God within his head." DGA 3769.

This evidence plainly contradicts Defendant and MRIA's findings that R.C. was not a danger to himself or others, did not display significant aggression or threatening behavior, and did not experience serious impairment of daily functioning. Defendant has failed to explain how such instances of violence, danger, and aggression justify a conclusion that R.C. did not pose a risk of harm to himself or others after only three days at Intermountain. Indeed, R.C.'s 90-day assessment notes his "estimated length of stay" as "12–18 months." DGA 988.

Accordingly, the court finds continued residential treatment at Intermountain was medically necessary because, without regulation, R.C. posed a risk of danger to himself and others and, without intervention or re-direction, was unable to function normally. Plaintiff, therefore, is entitled to benefits.

2. Full and Fair Opportunity for Review

Even if the record could support a contrary conclusion, Defendant disregarded relevant medical evidence and did not afford Plaintiff a full and fair review of his claims, as required under 29 C.F.R. § 2560.503-1(h), resulting in an unreasonable denial of benefits. ERISA requires "a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied … the reason for the denial must be stated in reasonably clear language[.]" *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) (finding claim administrator abused its discretion by denying benefits "without a rational explanation" and without "even acknowledging plaintiff's argument regarding her disability"); *see also Paine v. Investment and Administrative Committee of Walt Disney Sponsored Qualified*

*Benefits Plan*, 630 F. Supp. 3d. 1275, 1285 (C.D. Cal. 2022) ("Even if a plan administrator offers an explanation for its denial, it 'may not arbitrarily refuse to credit a claimant's reliable evidence.'") (quoting *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). "A plan administrator abuses its discretion if it renders a decision without any explanation, construes provisions of the plan in a way that conflicts with the plain language of the plan, or fails to develop facts necessary to its determination." *Anderson*, 588 F.3d at 649.

Here, neither Defendant nor MRIA provided any rational explanation for their findings, and failed to acknowledge, let alone rebut, Plaintiff's reliable evidence of medical necessity. There is no indication that Defendant or MRIA engaged with the voluminous medical record, consulted with R.C.'s treatment providers, or ascribed any weight to the letters of medical necessity or the extensive record of violent behavior, sexual aggression, and impaired functioning. None of the denial letters make any reference to the thousands of pages of probative evidence of medical necessity provided by Plaintiff or R.C.'s prior treatment providers, explain why they believed R.C. did not pose an ongoing risk of harm to himself or others, or attempt to reconcile their conclusions with Plaintiff's claims regarding R.C.'s need for residential treatment. Instead, Defendant summarily denied Plaintiff's appeals by concluding continued residential treatment was not medically necessary because R.C. did not pose a threat to himself or others, and could have been treated with outpatient care. DGA 2335. This is insufficient to warrant deference under an abuse of discretion standard of review. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 679 (9th Cir. 2011) ("Weighty evidence may ultimately be unpersuasive, but it cannot be ignored.").

Indeed, Dr. Holmes' second denial letter states the review "includes additional clinical information for consideration," but is practically identical to his first letter and does not contain any reference to the additional records reviewed or explain why such records were insufficient for Plaintiff to succeed on appeal. DGA 4214. Both letters

list the host of records received, but span less than four pages,[7] and do not address specifically why or how the contents of such records led to the determination that "the available clinical information does not support the medical necessity for continued residential treatment," because "there was no ongoing evidence of persistent risk of harm to self or others, no significant aggression or threatening behavior, and no evidence of serious impairment of daily functioning[.]" DGA 2334, 4216.

Moreover, ERISA provides that the "claims procedure of a group health plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim, unless, the claims procedures … [p]rovide that the health care professional engaged for purposes of a consultation" shall not be "an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal[.]" 29 C.F.R. § 2560.503-1(h)(3)(v). Here, Dr. Holmes was engaged by Defendant (through MRIA) for purposes of a consultation and conducted both the first and second-level review of Plaintiff's appeal for denial of benefits. *Compare* DGA 2334 *with* DGA 4216. This alone violates ERISA. *See* 29 C.F.R. § 2560.503-1(h)(3)(v). Even more troubling is that Dr. Holmes certified in his second report that he had "not had any prior involvement in the denial/appeal process for the case, regardless of whether the involvement was on behalf of [MRIA] or any other peer review vendor," (DGA 4215), when he had authored a report on behalf of MRIA in the same case less than one month prior. DGA 2332.

Notably, too, Defendant concedes members of its Benefits Committee were not in possession of medical credentials at the time Plaintiff's claim was determined (Dkt. 86-2 at 13–16), and that it is "unaware of a time in which [MRIA's] reviews of Anthem's claim denial involving care at a residential treatment center … resulted in a

---

[7] Indeed, the list of "Records Received" comprises one and a half pages of Dr. Holmes' three-and-a-half-page letter. DGA 4213–14. Another half page is dedicated to Dr. Holmes' "Conflict of Interest" statement. DGA 4215–16.

14

complete overturn of the underlying denial from 2019 to 2021." Dkt. 86-3 at 11–12; *see* 29 C.F.R. § 2560.503-1(h)(3)(ii) (explaining a plan does not provide a claimant with a full and fair review unless it "provide[s] for a review that does not afford deference to the initial adverse benefit determination …."). Defendant's blind and consistent approval of MRIA's claim reviews, especially where its relevant committee members did not possess credentials relevant to determining medical necessity, lends further credence to a finding of unreasonableness. Accordingly, the court finds Defendant's denial of Plaintiff's claim without sufficient explanation or detail, and Defendant's rubber-stamping of MRIA's findings, resulted in an improper denial of a full and fair review of Plaintiff's claim for benefits.[8]

## IV. CONCLUSION

Plaintiff's request to overturn Defendant's denial of benefits is GRANTED, and judgment is entered in Plaintiff's favor. Plaintiff may bring a motion for attorney's fees and costs as permitted under ERISA. *See* 29 U.S.C. § 1132(a)(1)(B), (g)(1). Plaintiff shall file a proposed judgment, and email a copy in Word format to the courtroom deputy, within five (5) business days from the filing of this Order.

IT IS SO ORDERED.

Dated: April 9, 2024

FERNANDO L. AENLLE-ROCHA
United States District Judge

---

[8] For the same reasons, the court finds Defendant breached its fiduciary duties, as ERISA requires a plan fiduciary to discharge its duties "for the exclusive purpose of [] providing benefits to participants and their beneficiaries" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A), (B).